**Lucius HAWKINS, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 16571.**

United States Court of Appeals
Eighth Circuit.

April 5, 1961.

Solbert Wasserstrom, Kansas City, Mo., for appellant.

Horace W. Kimbrell, Asst. U. S. Atty., Kansas City, Mo., for appellee.

Before SANBORN, VAN OOSTERHOUT, and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

In this jury-waived case, and on the evidence heard on motion to suppress evidence and to return seized property [1] the Court found Lucius Hawkins, some-

---

1. By stipulation the evidence adduced on motion to suppress constituted the factual foundation for the Court's decision on the merits.

times referred to as "defendant," guilty as charged under Count I of the information, of feloniously concealing and possessing a narcotic drug in violation of Title 21, § 174 U.S.C.A., and guilty as charged under Count II of the information of purchasing and possessing a narcotic drug in violation of Title 26, § 4704 (a) U.S.C.A. Judgment was pronounced committing defendant for a period of five years on Count I and two years on Count II, the sentences to be served concurrently.

The sole issue litigated below and presented on appeal goes to the validity of defendant's arrest and the search of his person which produced the narcotic drug and formed the basis for the prosecution. Concededly, defendant, was arrested and searched without benefit of a warrant previously issued. Title 26, § 7607 U.S.C.A.,[2] which defines the authority of narcotic agents in this respect, provides in pertinent part:

"The Commissioner, * * * and agents, of the Bureau of Narcotics * * * may——

"(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs * * * where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

Thus the key question is whether the information possessed by the arresting agents here gave them probable cause within the meaning of the unreasonable search and seizure safeguards of the Fourth Amendment[3] and reasonable grounds within the contemplation of § 7607, supra, to believe that defendant had "committed or is committing" a violation of the narcotic laws. If so, then, as stated by the Supreme Court in Draper v. United States, 358 U.S. 307, 310 and 311, 79 S.Ct. 329, 331, 3 L.Ed.2d 327, "the arrest, though without a warrant, was lawful and the subsequent search of [defendant's] person and the seizure of the found heroin were validly made incident to a lawful arrest, and therefore the motion to suppress was properly overruled and the heroin was competently received in evidence at the trial. Weeks v. United States, 232 U.S. 383, 392 [34 S.Ct. 341, 344, 58 L.Ed. 652]; Carroll v. United States, 267 U.S. 132, 158 [45 S.Ct. 280, 287, 69 L.Ed. 543]; Agnello v. United States, 269 U.S. 20, 30 [46 S.Ct. 4, 5, 70 L.Ed. 145]; Giordenello v. United States, 357 U.S. 480, 483 [78 S.Ct. 1245, 1248, 2 L.Ed.2d 1503]."

The hearing on the motion to suppress presented no problem with respect to crediting witnesses, for there was no conflict in the evidence. The controversy stems from application of the controlling legal principles, concerning which there is no substantial dispute, to the facts. In this situation it is deemed essential that a full resume of the evidence be made.

Defendant Hawkins is a Negro, 31 years of age at the time of the hearing. He was and for 14 years had been a member of the United States Army, and was stationed at Fort Riley, Kansas, living with his family in nearby Junction City, Kansas. The informer involved herein, one Clinton McLester, although not in military service, also resided in Junction City.

Captain John Flavin of the Kansas City Police Department, in charge of the narcotics division, testified that about the middle of January, 1960, he was informed that defendant, the informer Mc-

2. Added July 18, 1956, c. 629, Title I, § 104(a), 70 Stat. 570.

3. The Fourth Amendment of the Constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Lester and one Herby Lewis were involved in narcotic traffic in the Kansas City area, supplying narcotics to Junction City, Kansas, and to soldiers at Fort Riley, Kansas. Immediately after receiving this information, the Captain passed it on to narcotic agents Norbert Adamski and Joseph Dino, Jr.; that shortly before May 1, 1960, he received additional information that defendant was going to Chicago to make a purchase of narcotics for which Lewis was to furnish part of the money; that on his return the defendant would "drop off some of this stuff at Lewis' home." Upon acquiring this information the Captain notified agent Dino and also gave him a physical description of the defendant.

Apparently as a result of the information supplied by the Kansas City police, McLester was arrested on March 14, 1960, on a warrant issued out of the Federal Court for the District of Kansas on a narcotics charge. Thereafter McLester offered to cooperate with agents Adamski and Dino in their efforts to curb violations of the narcotic laws.

McLester had known defendant for approximately five years, and although the defendant testified they were not close friends, they had visited in each other's home and were more than mere acquaintances. Furthermore, McLester, also a user of narcotics, testified, without dispute, that defendant had supplied him with narcotics. Additionally, McLester accompanied the defendant in the latter's automobile to Chicago in February, 1959, where defendant procured a supply of narcotics. Although there was some vacillation in the testimony of defendant and McLester as to whether the latter knew of the purpose of the trip, we are persuaded that the trial court was fully warranted in finding that McLester was aware thereof, if indeed he was not a party thereto, because under direct examination by his attorney, the defendant himself testified, "We made a trip up there to get some narcotics. Q. To Chicago? A. Yes."

Shortly after McLester had offered to cooperate with the narcotics agents, he testified that he furnished agent Adamski with names and other information concerning narcotic activities in Chicago. Adamski corroborated McLester in this respect and stated further that he had forwarded the information so received to the Chicago narcotics office, and that the report which was returned from Chicago verified some of the statements McLester had made.

Agent Dino stated that McLester had supplied him with information prior to defendant's arrest, that as to one matter still under investigation Dino had not completed his investigation, but the information checked had proved correct. Dino also testified that prior to May 1, 1960 he had been informed by Captain Flavin that defendant, in association with McLester and Herby Lewis, was involved in narcotic traffic.

On April 30, which was a Saturday, McLester testified that he saw defendant on a street in Junction City, but had no conversation with him. The next morning (Sunday) around 3:30 o'clock, McLester was in Birdland, a night club in Junction City, and overheard a conversation between some unidentified persons that defendant "had gone to pick up," which, according to McLester, was a slang phrase, meaning, in his words, that "it is the same as going to buy narcotics." At approximately 6:30 A.M. on the same morning, McLester called agent Adamski by long distance telephone and gave the "tip" which formed a link in the chain of circumstances resulting in defendant's arrest. According to Adamski's testimony, he was informed by McLester that defendant was going to Kansas City, Missouri, in his automobile; that McLester described the automobile as a 1957 Oldsmobile with Michigan license R B 5131; that defendant would probably park the automobile near the home of Herby Lewis at 27th and Benton Streets in Kansas City, Missouri, would then proceed by airplane to Chicago and would return by plane to Kansas City that same day. Additionally, McLester described defendant as being of dark complexion, 6 to 6 feet 2 inches tall,

weighing about 190 pounds and wearing a mustache.

Adamski immediately called another agent and the two proceeded to the area of 27th and Benton Streets around 7:30 A.M. Being unable to locate the automobile which McLester described, they proceeded to the Kansas City municipal airport where they met agent Dino. The three were later joined by Captain Flavin and another officer of the Kansas City Police Department. Throughout the day the officers kept all incoming planes from Chicago under surveillance.

During the evening of May 1, and before defendant's arrest, Captain Flavin and another police officer drove to the vicinity of 27th and Benton and in front of 2735 Benton "located the blue colored Oldsmobile bearing Michigan license 5131 R. B." They relayed this information to Dino, who was at the airport.

At approximately 11:45 P.M. on May 1, 1960, flight 525 arrived from Chicago, and a Negro answering defendant's description was observed descending from the airplane. Agents Adamski and Dino stopped defendant near the exit of the terminal building and, upon identifying themselves, defendant gave his name and was placed under arrest. He was then taken to a room in the terminal, where he was searched, and the narcotics in question consisting of 11.7 grams of heroin hydrochloride were found secreted in a cigarette package taken from defendant's shirt pocket. Defendant readily admitted to the officers that he had gone to Chicago to purchase narcotics and that he had made numerous prior trips for the same purpose.

Defendant's version of the events on May 1, 1960, in summary, is that he was in charge of quarters at the army camp on that day; that he was not able to obtain another person to take his place until around 9:30 A.M.; that he then decided to go to Chicago, and that he had told no one of his intention of going. He drove his 1957 Oldsmobile to Kansas City, met his friend Herby Lewis at 27th and Benton Streets and Lewis drove him to the airport. He left his car keys with Lewis and told him to keep the automobile until he returned from Chicago. Upon his arrival in Chicago, defendant purchased narcotics from the same person with whom he had dealt in February, 1959, when he was accompanied by McLester. He admitted that he had made a number of similar trips to Chicago for the purpose of securing narcotics. Defendant described himself as being 5 feet 11½ inches tall, weighing 200 pounds and having a mustache.

In urging the insufficiency of the evidence to furnish reasonably prudent men with probable cause to believe that defendant was violating the narcotic laws at the time of his arrest, the defendant advances this three-prong attack: (a) the reliability of McLester as an informer had not been established by prior experience; (b) McLester's tip was based solely on hearsay, rumor and speculation; (c) McLester's tip in fact was not accurate.

■■ In dealing with probable cause "as the very name implies, we deal with probabilities. These are * * * the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, at page 175, 69 S.Ct. 1302, at page 1310, 93 L.Ed. 1879. Concededly, mere surmise or suspicion does not validly establish probable cause. See Henry v. United States, 361 U.S. 98, 104, 80 S.Ct. 168, 4 L.Ed.2d 134. " 'The substance of all definitions' of probable cause 'is a reasonable ground for belief of guilt'. * * * Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had *reasonably trustworthy information* [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U. S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543, 39 A.L.R. 790.]" (Emphasis supplied). Brinegar v. United States, supra, 338 U.S. at pages 175, 176, 69 S.Ct. at

pages 1310, 1311; Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327. From the foregoing it becomes manifest that there is no set formula or criteria to be followed or applied in determining whether probable cause and reasonable grounds existed within the meaning of those terms as clearly expressed in Draper, supra. That question must be resolved from consideration and analysis of all of the facts and circumstances when viewed in their totality.

■ As to contention (a), manifestly it is without substance. From the detailed resume of the evidence, it conclusively appears that McLester's previous reliability had been established. He had furnished information concerning narcotic activities which had been proved accurate. Hence, when Adamski received the telephone call from McLester on the morning of the arrest, and in view of other corroborative information within his knowledge, he was fully justified in the belief that the information then obtained concerning defendant's trip to Chicago that day and the purpose thereof would prove correct. It did in every minute detail.

■ Having this "reasonably trustworthy information," it has not been demonstrated to our satisfaction that the actual source of McLester's information is decisive, which is the gist of contention (b), and we refrain from delving into the question of the validity and source of an informer's information as such. On this question it should suffice to say that by uncontroverted evidence it was established that McLester was rather intimately acquainted with defendant, particularly his endeavors and activities in the illegal trafficking of narcotics; he was one of the defendant's customers, and had accompanied defendant to Chicago on a prior occasion when narcotics were obtained, all of which formed some basis for his acting on the statements he heard in the Birdland night club. But again, emphasis must be focused on the information in possession of the officers and their right, as reasonable men, to act thereon.

Contrary to defendant's contention, Draper v. United States, supra, does not stand for the proposition that the informer's tip or the information furnished the arresting officer must be based on first-hand knowledge. The majority opinion indicates that the informer died a few days after the defendant's arrest and the source of the information which he imparted to the arresting officer is not disclosed. Mr. Justice Douglas, in his dissent, states that the arresting officer did not know the grounds upon which the informer based his conclusion. A more complete statement of the facts is found in the dissenting opinion of the Court of Appeals, Draper v. United States, 10 Cir., reported at 248 F.2d 295, and from this we learn that the officer acted solely on the informer's tip, unsupported or corroborated by any other evidence or circumstance whatsoever. In fact, it is pointed out, at page 300 of 248 F.2d, that the arresting officer did not know Draper, or in fact even know that such a person existed, until he received the tip from his informer.

■ Contention (c) is likewise without merit. While in retrospect it might appear that McLester's information was inaccurate as to the departing time of defendant for Chicago, this is entirely irrelevant to the question of the officers' reasonable grounds for belief at the time of arrest. And, for what it is worth, we might observe that in all material and substantial respects, McLester's information proved correct in every detail.

In summary, we are fully convinced that this case falls well within the bounds of Draper. We have here a situation where the narcotic agents had verified every item of information which they had obtained from a reliable informer, except the ultimate fact of whether defendant had fulfilled his mission and had narcotics on his person. Under all of the circumstances, the agents had "reasonable grounds" to believe that the final piece of information was correct, that is, that defendant was violating federal

narcotic statutes, and therefore it was their duty to make the arrest.

We hold that the search and seizure here was incident to a valid arrest, that the narcotics were properly received into evidence, and the conviction of defendant is

Affirmed.