202

UNITED STATES of America,
Plaintiff,

v.

Patsie COMB, Defendant.

UNITED STATES of America,
Plaintiff,

v.

Jimmy Dale GLADDING, Defendant.

Crim. Nos. 4477, 4483.

United States District Court
W. D. Arkansas,
Texarkana Division.

March 26, 1962.

Charles M. Conway, U. S. Atty., James Gutensohn, Asst. U. S. Atty., Fort Smith, Ark., for plaintiff.

George F. Edwardes, Texarkana, Ark., for defendants.

JOHN E. MILLER, Chief Judge.

Separate criminal informations were filed against Patsie Comb on March 6, 1961, and Jimmy Dale Gladding on August 4, 1961, charging them with violation of 16 U.S.C.A. § 704 and the regulations promulgated thereunder pertaining to the hunting and killing of migratory birds.

The defendants pleaded not guilty; waived a jury trial; and by consent of the parties the cases were consolidated and tried to the court on March 14, 1962.

The information against Patsie Comb charged:

"That on November 4, 1960, in the Western District of Arkansas, Texarkana Division, Patsie Comb did unlawfully hunt and attempt to kill migratory birds, to-wit: wild ducks, in violation of 16 U.S.C.[A. §] 704."

The charge filed against the defendant, Jimmy Dale Gladding, is identical except as to the name of the defendant.

The defendants denied that they were unlawfully hunting and attempting to kill migratory birds at the time charged in the informations, and also denied that they were at the place described by the witnesses for the Government.

Title 16 U.S.C.A. § 703 provides:

"Unless and except as permitted by regulations made as hereinafter provided in sections 703–711 of this title, it shall be unlawful at any time * * * to hunt * * * any migratory bird * * * included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916 * * *, and the United States and the United Mexican States for the protection of migratory birds * * * concluded February 7, 1936."

Sec. 704 provides:

"Subject to the provisions and in order to carry out the purposes of the conventions, referred to in section 703 of this title, the Secretary of the Interior is authorized and directed, from time to time, having due regard to the zones of temperature and to the distribution, abundance, economic value, breeding

habits, and times and lines of migratory flight of such birds, to determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow hunting * * * and to adopt suitable regulations permitting and governing the same * *."

Sec. 707(a) (1961 Supp.) provides:

" * * * any person * * * who shall violate any provisions of said conventions or of sections 703–711 of this title, or who shall violate or fail to comply with any regulation made pursuant to said sections shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $500 or be imprisoned not more than six months, or both."

The pertinent regulation promulgated by the Secretary, as authorized by 16 U.S.C.A. § 704, appears in 50 C.F.R., Sec. 10.51, and provides:

"Subject to the provisions of the preceding sections of this part, the areas open to hunting, respective open seasons (dates inclusive), the shooting hours and the daily bag and possession limits on the species of waterfowl and on coot and Wilson's snipe as designated in this section are prescribed between the dates of September 1, 1960 and January 31, 1961 as follows:

\* \* \* \* \* \*

"(d) Mississippi Flyway States.

Shooting One-half hour before hours. sunrise until sunset (standard time) on all species

Seasons in:

Arkansas Nov. 23–Jan. 1"

The daily bag limit in Arkansas during that season was four ducks and the possession limit was eight ducks. The season did not open in Arkansas until 12 o'clock noon, standard time, on November 23, 1960, and continued subject to the prescribed hours until January 1, 1961.

On November 4, 1960, at about 9:30 a. m., Carl E. Gallion, an Arkansas State Game Warden, parked his truck about a quarter of a mile from an area known as Days Creek in Miller County, and was walking toward the creek when he heard several shots from shotguns in the vicinity between what is known as Blakmon Ferry Road and Days Creek. Mr. Gallion then walked to an area known as White Oak Flats where he found an old boat pulled out on the bank. He launched the boat and proceeded to paddle it toward where he had heard the shooting. At that time he heard a second volley of shots which were about one-quarter of a mile away in the same direction. He proceeded up Days Creek until he rounded a bend and entered the mouth of Twin Slough. Upon entering the slough he saw directly ahead of him, at an estimated distance of 200 yards, five ducks flying low over the water near a blind along the shore line, the occupant of which fired two shots and killed one of the flying ducks. The Warden moved up the slough in the boat, keeping under cover as much as possible, and when he had gone approximately 75 yards he approached another blind in which Wiley Comb (since deceased, and a brother of the defendant, Patsie Comb), and the defendant, Jimmy Dale Gladding, were stationed. He was first detected by Wiley Comb and then by the defendant Gladding. Mr. Gallion at that time was within approximately 50 feet of the blind in which Wiley Comb and the defendant Gladding were stationed. He continued to move the boat toward the blind, and at the same time called to each of them and advised that he desired to talk to them, but both Wiley Comb and the defendant Gladding jumped from the blind to the shore and ran into the underbrush and trees. Each left the blind carrying a shotgun and wearing hip boots, and they refused to stop although the Warden called each of them by his name.

After Wiley Comb and the defendant Gladding had escaped from the blind, the Warden continued to move his boat to-

ward the blind which he had first observed upon entering the mouth of the slough and from which blind one of the flying ducks had been killed. He had reached a point approximately 25 feet away from that blind when the defendant, Patsie Comb, arose and saw the Warden approaching. Mr. Gallion called the defendant, Patsie Comb, by name and asked him to come out of the blind, but the said defendant, wearing hip boots and carrying a shotgun, escaped from and blind and ran into the underbrush and thick trees.

After the defendant, Patsie Comb, had escaped, the Warden went inside the blind and found several spent shotgun shells, a thermos bottle, and a sack. Upon further search he also found a decoy line stretched along in front of the blind and fastened at each end to a stake set in the water. The line was about an eighth of an inch thick and had short lines extending from the main line for a distance of approximately eight inches, to which were attached snaps, but there were no live decoys on that line. He then returned to the blind that had been occupied by Wiley Comb and the defendant Gladding, and there he found a similar line to which were attached four live, tame mallard decoys. The line was similar in all respects to the one that was near the blind that had been occupied by the defendant, Patsie Comb. Mr. Gallion took possession of the decoys and removed from one of the legs of each duck two metal rings, one around the leg and the other attached to the ring for snapping on or attaching to the lead string secured to the main line. After taking possession of the decoys and removing the lines and rings, he entered the blind that he had first approached, occupied by Wiley Comb and the defendant Gladding, and there found a hunting coat, a box containing live shotgun shells, some spent shells, and four dead, wild mallard ducks, together with a sack similar to the one that was found in the blind occupied by the defendant, Patsie Comb. He then returned to his truck and later that day attempted to contact the defendants in or near the village of Fouke, in Miller County where they resided.

On the same date two men, H. W. Winkley and A. J. Smith, had gone fishing, and among other places fished at "Round Hole" on Boggy Creek. After they had ceased fishing, they returned to a road which ran near "Round Hole" to await the arrival of Mrs. Winkley in a truck to convey them to their home near Fouke, Arkansas. At that point they were approximately 2½ miles from the vicinity where the duck blinds were situated, and the road extended into the area where the blinds were. While Winkley and Smith were fishing, they heard several shots from shotguns from the direction of the vicinity of the blinds. At approximately 11:30 a. m. while these men were waiting on roadside, a car approached from the direction of Days Creek. It slowed up to allow the passage of another car coming from the opposite direction, and the witnesses Winkley and Smith recognized the driver of the car coming from the direction of the blinds as the defendant Gladding, and the passenger as Wiley Comb. They did not stop but continued driving past Winkley and Smith. A short time later while they were still awaiting the arrival of their conveyance, the defendant, Patsie Comb, walked up the same road from the direction of Days Creek, carrying a shotgun and wearing hip boots rolled down to the knees. Upon being asked by Mr. Winkley whether the defendant Gladding and Wiley Comb had gone away and left him behind, the defendant, Patsie Comb, replied that he had been hunting squirrels and was merely walking to another squirrel hunting area.

Approximately one week subsequent to November 4, 1960, Mr. Gallion, in company with Mr. Harris, an agent for the State of Arkansas, and Mr. Turner, a United States Game Warden, went to Patsie Comb's house in the daytime to see the defendant, Patsie Comb, and ask him some questions concerning his activities on the day of the alleged offense. Upon approaching the gate to the front

yard of the house, they saw approximately two dozen live, tame mallard ducks loose in the front yard. The gate was unlocked, and the three men entered the yard in order to go up to the front door of the house. While proceeding up the front walk, they more closely observed the tame mallard ducks in the front yard, and noticed that approximately 18 or 20 had rings on their legs similar to those found on the legs of the live decoy line at the scene of the alleged offense by Mr. Gallion on November 4, 1960. The ducks in defendant, Patsie Comb's, front yard were merely observed and neither they nor the rings on their legs were picked up or taken away by the officers. The Wardens proceeded to Patsie Comb's front porch and knocked on the door, but they did not find him at home, after which they left.

The attorney for the defendants objected to the introduction of the testimony of Mr. Gallion as to the presence of the tame mallard ducks with the rings on their legs that he had observed in the front yard of defendant, Patsie Comb's, home on the ground that it was evidence obtained by unlawful search and seizure, in that Mr. Gallion and the other Warden had entered the curtilage of defendant's home without having obtained a search warrant or a warrant for his arrest.

■ The court admitted the testimony over the objection, subject to further consideration, and having now considered the briefs submitted by each party in support of and in opposition to the objection, is of the opinion that the testimony is admissible, and the objection should be overruled.

The defendant, Patsie Comb, based his objection on the holding in the case of Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, but the court does not believe that the decision sustains the contention. In the cases of Ellison v. United States, 93 U.S.App.D.C. 1, 206 F.2d 476 (1953), and Burt v. United States, 139 F.2d 73 (5 Cir., 1944), it was held that law enforcement officers can approach the premises and go to the front door of a suspect's residence in order to question him or to inquire as to his whereabouts. The officers are not intruding upon the privacy of a suspect by so doing, nor does their observation of the premises and surroundings constitute a search. In Ellison, supra, 206 F.2d at page 478 the court said:

"The bottles and cigarettes were not covered or hidden, though it may have been necessary to bend over the porch rail to see them. There was no intrusion into appellant's privacy. Nor did mere observation constitute a 'search.' If an officer sees the fruits of crime—or what he has good reason to believe to be the fruits of crime—lying freely exposed on a suspect's property he is not required to look the other way, or disregard the evidence his senses bring him. Law enforcement is difficult enough, without requiring a police officer to free his mind of clues lying flatly before him."

■ The testimony objected to by the defendant, Patsie Comb, was relevant and admissible. In fact, the defendant admitted that he owned the ducks that were in his yard, and that they were "tamed wild" mallards and that the rings on their legs were there as a convenience for handling and tying the ducks. There was no dispute but that the rings taken by the Warden from the ducks that were tied to the decoy line were identical with those on the legs of the ducks in the yard which the Warden observed.

■ Both defendants vigorously denied being present at the time and place described by the Warden, or that they were hunting ducks. The defendants insisted that they were in the woods hunting squirrels, but notwithstanding their testimony, the court is convinced from a consideration of all of the testimony and the circumstances disclosed thereby that the defendants are guilty and that the material allegations in each information have been established beyond a reasonable doubt.

Therefore, judgment is being entered today finding each of the defendants guilty, and assessing a fine of $150.00 against the defendant, Patsie Comb, and $100.00 against the defendant, Jimmy Dale Gladding, and allowing each defendant a period of not more than ten days in which to pay the fine, and at the expiration of ten days, if the fine is not paid, a commitment will be issued for imprisonment of the defendants until the fine is paid or until the defendants are discharged as provided by law.