**UNITED STATES of America, Plaintiff,**

v.

**Harry William THERIAULT, Defendant.**

**Crim. No. 1296.**

United States District Court
W. D. Arkansas,
El Dorado Division.

April 24, 1967.

Charles M. Conway, U.S. Atty., Ned A. Steward, Jr., Asst. U.S. Atty., Fort Smith, Ark., for plaintiff.

Robert C. Compton, Dennis L. Shackleford, El Dorado, Ark., for defendant.

## MEMORANDUM OPINION

OREN HARRIS, Chief Judge.

The above styled case having come on to be heard on April 6, 1967, upon a Motion to Suppress filed by the defendant, the response of the Government thereto, and the briefs of the parties and the Court being sufficiently advised in the premises does hereby make the following findings of fact and conclusions of law with respect to the issues joined.

### FINDINGS OF FACT

During the night of December 10, 1966, or early morning of December 11, 1966, the Bank of Parkdale, Parkdale, Arkansas, was burglarized and various properties of the bank, including large amounts of silver, were taken from the bank.

In the early afternoon of Sunday, December 11, 1966, the defendant, Henry William Theriault, aka Gerald Samuel Clevinger, along with a companion, William Johnson Huddleston, aka Glendale Sam Gillespie, registered into the Sahara Motel in DeWitt, Arkansas, and were assigned rooms 19 and 20 in the motel. While proceeding to their rooms, Mr. John Wofford, Manager of the Sahara Motel, saw that these two men were traveling in a late model pickup truck with a vinyl top and further observed when the men were entering their rooms that the defendant had an injured foot and had to be assisted into his room by

his companion. As only Mr. Huddleston had entered the motel office for the registration process, this was the first time that Mr. Wofford had seen the defendant. Later that same afternoon, after the defendant and Huddleston had entered their rooms in the Sahara Motel, Mr. Huddleston left his room, when to a cafe adjoining the motel, and ordered some sandwiches to "go". While waiting for the sandwiches to arrive, Mr. Huddleston exchanged ten "Kennedy" half dollars for a $5.00 bill, but when the sandwiches arrived, Mr. Huddleston paid for them by negotiating a $20.00 American Express Travelers Check. After paying for the sandwiches, Mr. Huddleston left the cafe.

During this same afternoon of December 11, 1966, Mr. Kenneth Kirkpatrick, the operator of the cafe adjoining the motel, was in his trailer home near the cafe watching a newscast over television. In the course of this newscast Mr. Kirkpatrick heard that the Bank of Parkdale, Parkdale, Arkansas, had been burglarized the night before, that two men driving a late model pickup truck were suspected of being the burglars, and that a safe had fallen on the foot of one of the suspects. At the conclusion of the newscast, Mr. Kirkpatrick proceeded to his cafe in order to check his business and on arrival at the cafe learned of the passing of the "Kennedy" half dollars and the American Express Travelers Check earlier that afternoon by Huddleston. Because "Kennedy" half dollars were not frequently received in the course of Mr. Kirkpatrick's cafe business during that period of time and because the travelers check appeared to be improperly negotiated, Mr. Kirkpatrick became apprehensive about this incident. He, therefore, inquired of Mr. Wofford in the office of the Sahara Motel if the person who had negotiated the travelers check at his cafe was staying in the motel and was advised that Huddleston was a motel guest, along with a companion who had an injured foot. Mr. Kirkpatrick then returned to his cafe.

As Mr. Kirkpatrick was about to enter his cafe, he noticed that a DeWitt police officer, Officer Roy Munnerlyn, was drinking coffee in the cafe. Mr. Kirkpatrick beckoned to Officer Munnerlyn to leave the cafe and join him outside. As soon as Officer Munnerlyn joined Mr. Kirkpatrick outside the cafe, Mr. Kirkpatrick told the officer of the half dollars and travelers check passing incident that had occurred in his cafe earlier that afternoon, that the passer of the check was a guest at the Sahara Motel together with a companion who had an injured foot and told the officer of the news he had heard over television concerning the burglary of the Bank of Parkdale. Officer Munnerlyn upon receipt of this information became suspicious and entered his patrol car which was parked outside the cafe and placed a radio call to Stuttgart Police requesting information on the Parkdale Bank burglary. Stuttgart radio replied and Officer Munnerlyn learned that the Parkdale Bank had in fact been burglarized the night before, that two men driving a late model pickup truck, silver in color, with a vinyl top and missing bumper, were believed to have committed the burglary and that one of the men had an injured foot. As soon as this radio message was concluded, Officer Munnerlyn and Mr. Kirkpatrick proceeded to the motel where the two of them looked at the truck in which the defendant and Huddleston were traveling. Noting that the truck matched the description of the burglars' truck given over the radio even as to the missing bumper, Officer Munnerlyn requested Mr. Kirkpatrick to notify another DeWitt police officer, Officer Willie Ferguson, who lived in a house trailer adjoining Mr. Kirkpatrick's trailer, of the situation and to instruct Officer Ferguson to immediately come to the motel and assist Munnerlyn. Mr. Kirkpatrick proceeded to the trailer of Officer Ferguson, found Officer Ferguson in his trailer and instructed him to come to the motel and assist Officer Munnerlyn. Officer Ferguson immediately put on his uniform and sidearm and went to the side of Officer Munnerlyn. One of the officers then placed a radio call on Offi-

cer Munnerlyn's patrol car radio to the DeWitt Police Department radio operator and requested the operator to inform DeWitt Police Chief Verne Harrison of the facts known by the officers. While waiting for Chief Harrison, Officer Ferguson kept the motel under surveillance and at one point observed William Johnson Huddleston make a telephone call at a telephone booth adjacent to Huddleston's motel room and then observed Huddleston to return to his room.

At the time Huddleston and defendant registered into the Sahara Motel, J. D. Richardson, a guest at the motel, was in the motel office with Mr. Wofford and observed the same events observed by Mr. Wofford. Also, Mr. Richardson heard a newscast relating to the Parkdale Bank burglary. After talking among themselves and after examining the truck in which the defendant and Huddleston were traveling, seeing in the bed of that truck cutting torches, punch bolt cutters, and other tools useful in burglary and noting also in the bed of the truck a cardboard box containing rolls of coins, cloth money bags, and a closed black bag, Mr. Richardson and Mr. Wofford concluded that the defendant and Mr. Huddleston were the Parkdale Bank burglars. This conclusion was reached independently of any conclusion which Mr. Kenneth Kirkpatrick and Officers Munnerlyn and Ferguson might have reached in this same respect and was reached without the knowledge of those parties. After examining the truck, Mr. Wofford and Mr. Richardson sought out the Sheriff of Arkansas County to relate to him their conclusions, but having failed to locate the Sheriff, the two men returned to the Sahara Motel.

Pursuant to the radio request of Officers Munnerlyn and Ferguson, DeWitt Police Chief Verne Harrison was contacted at his home twenty miles from DeWitt by the DeWitt police radio operator and was advised that two men matching the description of the Parkdale Bank burglars were presently in DeWitt at the Sahara Motel. Prior to the time Chief Harrison received this message from the DeWitt radio operator, he had had the newscast on the Parkdale Bank burglary but had failed to retain any of the details given. As soon as Chief Harrison received the aforementioned message from his radio operator, he immediately attempted to contact Arkansas State Police Criminal Investigator James Beech and the Sheriff of Arkansas County to obtain additional information. Chief Harrison was unable to get in touch with James Beech but left word for Beech to come to DeWitt as soon as possible. The Arkansas County Sheriff was contacted but he could give Chief Harrison no information. The Sheriff did, however, advise Chief Harrison to proceed to the Sahara Motel and to contact him if the Chief needed any assistance there. Chief Harrison then drove to the police station in DeWitt, picked up his police car and arms and drove to the Sahara Motel. While at the police station, Chief Harrison was advised by DeWitt police radio operator that the defendant and Huddleston were going to leave the motel at 7:00 p. m., and that Chief Harrison should, therefore, hurry to the motel. The radio operator had learned this information earlier from the officers at the scene.

Upon arriving at the motel, Chief Harrison immediately drove his patrol car in front of the pickup truck of the defendant and Huddleston, in order to hinder a possible escape in the truck, got out of his patrol car and while standing in the driveway looked at the truck. Chief Harrison observed numerous tools in the bed of the truck, including cutting torches, punch bolt cutters, and other tools susceptible of being used for a burglary operation and also observed a cardboard box in the bed of the truck containing rolls of money, cloth money bags, and a closed black bag. Having concluded his inspection of the truck, Chief Harrison was joined by Officers Munnerlyn and Ferguson and the three of them took up positions outside of the two rooms, rooms 19 and 20, occupied by the defendant and Huddleston. Chief Harrison then instructed the Manager of the motel, Mr. Wofford, to telephone the de-

fendant and Huddleston in their motel rooms, and advise them they were surrounded by the police and to come out with their hands up. Mr. Wofford carried out this instruction whereupon Huddleston opened the door of his room and approached the Officers with his hands raised. Chief Harrison asked Huddleston where his companion, the defendant, was and was told by Huddleston that he was in bed inside the motel room and was unable to come outside because of an injured foot. Huddleston also told Chief Harrison that his companion had a gun under the mattress of the bed in which he was lying but that he did not think the defendant would try to use it. While Chief Harrison was placing Huddleston in his patrol car, he directed Officers Munnerlyn and Ferguson to go inside the motel room and apprehend the defendant. Officer Ferguson with sidearm drawn entered the open door of the motel room from whence Huddleston had come and through an open door into the adjacent motel room saw the defendant lying in bed with his injured foot protruding out from the bed covers. Officers Munnerlyn and Ferguson then entered the defendant's room, had the defendant sit up on the bed, searched his person and assisted him outside into the police car with Huddleston. After the defendant and Huddleston got into the police car, Chief Harrison entered the defendant's room, searched the bed in which the defendant had been lying and discovered a pistol and a book of travelers checks under the mattress of the bed. The defendant and Huddleston, accompanied by Chief Harrison and Officer Ferguson, were immediately driven to the DeWitt Police Station in Chief Harrison's police car. The arrest of the defendant as hereinabove described was without a warrant and the searches and seizures hereinabove described and hereinafter described were likewise without a warrant.

When the defendant and Huddleston were taken from the Sahara Motel in Chief Harrison's police car, Officer Munnerlyn followed Chief Harrison in the pickup truck. The keys to the truck were in the ignition. Upon arrival at the DeWitt Police Station, the defendant and Mr. Huddleston were taken inside the station and Officer Munnerlyn, with the assistance of others, was directed by Chief Harrison to unload the pickup truck which Munnerlyn had driven to the station. In addition to the cardboard box containing money rolls, cloth money bags and a black bag and the tools in the bed of the truck, a .38 pistol and rolls of coins were found in the glove compartment of the truck and a cigar box containing money and other property was found on the floor in the cab of the truck. All of the property found in the bed of the truck, including the cardboard box with its contents which was so heavy as to require three persons to carry it, were carried into the Police Station and placed in a room. The property found in the glove compartment of the truck and on the floor in the cab of the truck were likewise taken into the Police Station and put in this room, but none of the property found in the glove compartment and cab of the truck were comingled with the property in the cardboard box found in the bed of the truck. All of this property was subsequently inventoried and retained by the arresting officers.

The arrest of the defendant and Mr. Huddleston at the Sahara Motel occurred at approximately 7:00 p.m. While they were being transported to the Police Station they were neither questioned in any manner by the Police Officers or told they were being held on suspicion of bank burglary. Neither did they inquire of the officers as to the purpose or reason for their being held or taken in custody. They knew the officers had also taken in custody their truck (pickup) with the articles, materials and property as described herein and were following them to the Police Station, arriving at the same time.

After arriving at the DeWitt Police Station and being taken inside, Chief Harrison asked the defendant his name. The defendant told him he was Gerald Samuel Clevinger. Shortly after Chief

Harrison had obtained the defendant's purported name, Arkansas State Police Criminal Investigator, James Beech, arrived at the DeWitt Police Station and took the defendant into a room adjoining Chief Harrison's office for interrogation. Before Mr. Beech asked the defendant any questions, the defendant was advised by Mr. Beech of his constitutional rights, including his right to remain silent, that anything he might say could be used against him and that he was entitled to an attorney, either of his own choosing or a court-appointed attorney in the event the defendant did not have sufficient funds to employ his own. Having been advised of these constitutional rights, the defendant declined to answer any questions and the interrogation session was terminated. Due to the condition of the defendant's injured foot, a local physician was called to the DeWitt Police Station to examine the defendant's foot. The physician recommended that the defendant be hospitalized as soon as possible, and an ambulance was called to transport the defendant to Little Rock, Arkansas, for hospitalization. The defendant was accompanied on this ambulance trip by Officer Ferguson, but was released to the custody of FBI Agent Leander Muncey upon arriving at the Baptist Hospital in Little Rock. The defendant was refused admittance at the Baptist Hospital and was subsequently transferred to the University of Arkansas Medical Center in Little Rock for hospitalization that same night. On entering the University of Arkansas Medical Center, the defendant was placed in the custody of the U. S. Marshal for the Eastern District of Arkansas.

On Monday, December 12, 1966, a complaint was filed by the U. S. Commissioner, John G. Holland, in Fort Smith, Arkansas, Western District of Arkansas, charging the defendant with the violation of 18 U.S.C. § 2113(b) and a warrant of arrest was subsequently issued by the said Commissioner. On this same day, the U. S. Marshal for the Eastern District of Arkansas, the Honorable Pat Henderson, inquired of Deputy U. S. Marshal Lindsey Deal who was then guarding the defendant at the University of Arkansas Medical Center, as to whether or not the defendant's physical condition would permit a preliminary hearing. Marshal Henderson was advised by Deputy Marshal Deal that the defendant was at that time in no condition to have a preliminary hearing. Later that afternoon, the hospital authorities at the University of Arkansas Medical Center contacted Marshal Henderson and advised that an incident had occurred at the Medical Center in which the defendant had struck one of his attending physicians. Because of this incident, the hospital authorities requested that the defendant be removed from the Medical Center immediately. In order to comply with the Medical Center's request, Marshal Henderson consulted with the Bureau of Prisons, Washington, D. C., and was advised that he should transfer the defendant to the Springfield Medical Center, Springfield, Missouri, for further hospitalization. After consulting with the resident jail physician for the U. S. Marshal's office, Eastern District of Arkansas, and with U. S. District Judge J. Smith Henley relative to following this advice, Marshal Henderson decided to remove the defendant to the Springfield Medical Center.

On the following day, December 13, 1966, U. S. Commissioner John Coates, Eastern District of Arkansas, Little Rock Division, went to the University of Arkansas Medical Center where the defendant at this point was still hospitalized in order to afford the defendant a preliminary hearing. Commissioner Coates had a letter from the FBI written to Marshal Henderson, Defendant's Exhibit No. 2, advising the Commissioner of the charge upon which the defendant was being held. However, Commissioner Coates did not have the Complaint nor warrant of arrest issued the day before by Commissioner Holland in Fort Smith and therefore determined that a preliminary hearing could not be had. Although the Commissioner did not hold a preliminary hearing at this time, he

did see the defendant in the Medical Center, read him the FBI letter in his possession, advised the defendant of his right of counsel, and that counsel would be appointed for him if he was unable to employ his own, and set a bond for the defendant in the amount of $5,000.00. The defendant stated to the Commissioner that he did not desire to have a lawyer appointed for him. No further hearing was had by Commissioner Coates or any other Commissioner,

On the afternoon of December 13, 1966, the defendant, in the custody of the U. S. Marshal for the Eastern District of Arkansas, was transported by ambulance to the Springfield Medical Center in Springfield, Missouri, and remained there until he was medically discharged. On February 8, 1967, the defendant was returned from Springfield to the Union County Jail, El Dorado, Arkansas.

When the presence of the defendant in the Union County Jail came to the attention of this Court, Mr. Joseph Mahoney, III, an El Dorado attorney, was directed to interview the defendant in the Union County Jail and determine whether the defendant desired to be represented by an attorney and his wishes with respect to a preliminary hearing or Grand Jury Indictment. The defendant advised Mr. Mahoney that he did desire a preliminary hearing, that he did not wish to waive Indictment, and that he desired an attorney to represent him. Upon learning of Mr. Mahoney's relative inexperience in federal criminal matters, the defendant told Mr. Mahoney that he wanted a lawyer more experienced than Mr. Mahoney to represent him. These expressions by the defendant were conveyed to this Court.

During the course of Mr. Mahoney's interview with the defendant certain letters were exhibited to Mr. Mahoney by the defendant, including a letter from the Vice President of the United States and the Chief Justice of the United States. Other letters shown to Mr. Mahoney were letters written by the de-

fendant at the Springfield Medical Center but never mailed.

On February 15, 1967, a Grand Jury for the Western District of Arkansas returned an indictment against Harry William Theriault charging him with violation of 18 U.S.C. Section 2113(b).

On the same day that the above mentioned indictment was returned, the defendant, then being in the Union County Jail, advised FBI Agent Floyd Thomas that he had something to tell Special Agent Thomas. Although Special Agent Thomas did not interview the defendant on February 15, 1967, he did present himself before the defendant as requested the following day, February 16, 1967. However, before anything was said, Special Agent Thomas warned the defendant of his constitutional rights, and being advised by the defendant that he desired to waive these rights for purposes of the impending interview, had the defendant execute a waiver of such rights in writing, introduced at this hearing as Government Exhibit 1. An interview then took place, and the defendant made several statements to Special Agent Thomas. On February 17, 1967, Special Agent Thomas returned to the Union County Jail and again presented himself before the defendant for a further interview. Once again, the defendant was advised of his constitutional rights before anything was said and as before, the defendant chose to waive these rights and signed a written waiver to that effect. This waiver having been introduced herein as Government Exhibit 2. Additional statements of the defendant were then taken by Special Agent Thomas.

On March 6, 1967, the defendant was brought for arraignment before this Court and after being advised of his constitutional rights including his right to counsel, the defendant requested appointment of counsel. Mr. Bob Compton, an able and experienced attorney of El Dorado, Arkansas was appointed to represent the defendant. At the request of Mr. Compton, the defendant's arraignment was continued until the following day to give counsel an opportunity to

confer with the defendant. On March 7, 1967, the defendant was again brought before the Court for arraignment whereupon he entered a plea of not guilty. The trial of the defendant's case was then set for April 4, 1967, without objections from defendant's counsel. On March 14, 1967, the defendant filed a request for a Bill of Particulars, and on March 17, the Government responded thereto. Hearing was had on the defendant's Motion for a Bill of Particulars and on March 30, 1967, same was denied. On March 23, 1967, the defendant filed a Motion for Continuance of the trial and this Motion was granted on March 30, 1967, the Court continuing the trial date to May 1, 1967. Also, on March 30, 1967, the Court gave the defendant five days within which to file any other pretrial motions he might care to make, and on April 3, 1967, the subject Motion to Suppress was filed.

## CONCLUSIONS OF LAW

The defendant objects to the admissibility as evidence of his statements made to Special Agent Thomas on February 16 and 17, 1967, while he was being held in the jail at El Dorado, Arkansas, arguing that non-compliance with Rule 5 of the Federal Rules of Criminal Procedure by the authorities rendered the statements of the defendant inadmissible under the authority of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

The defendant was not granted a preliminary examination contemplated by Rule 5(b). As set forth in Mallory v. United States, supra, this procedural requirement had as its aim the avoidance of "secret interrogation of persons accused of crime." The purpose of the arresting officers in DeWitt of removing the defendant to Little Rock prior to taking him before a committing officer was not the purpose of imposing "third degree" practices on the defendant. Rather it is undisputed that their motive was to comply with the directions of medical authorities that the defendant needed immediate medical treatment caused by his bleeding foot. The overriding medical consideration continued through Monday when the United States Marshal was advised that the defendant was in no shape for a hearing. The defendant's action of striking the medical attendant who was treating him is some evidence of the inappropriateness at this time of a hearing. When these facts are considered along with the fact that Commissioner Coates had no copy of the warrant of arrest which had been issued, nor a copy of the complaint, a preliminary examination as contemplated by Rule 5 could not be had. The physical condition of the defendant and the absence of a copy of the complaint and warrant necessitated delay.

The Court finds that delay in having a preliminary examination from the time of the arrest until after the Commissioner had set the defendant's bond was not unreasonable in view of the fact then existing. Although the failure to give the defendant a preliminary examination at some time after he was transported to Springfield Medical Center is unexplained, there is no evidence and no reasonable inference can be drawn that such failure was brought about to secure an incriminating statement from the defendant. No attempt to interrogate the defendant about this crime was made following his removal from DeWitt, Arkansas.

The facts in Mallory v. United States, supra, are distinguishable.

"Petitioner was arrested in the early afternoon and was detained at headquarters within the vicinity of numerous committing magistrates. Even though the police had ample evidence from other sources than the petitioner for regarding the petitioner as the chief suspect, they first questioned him for approximately a half hour. When this inquiry of a nineteen-year-old lad of limited intelligence produced no confession, the police asked him to submit to a 'lie-detector' test. He was not told of his right to counsel or to

a preliminary examination before a magistrate, nor was he warned that he might keep silent and 'that any statement made by him may be used against him.' After four hours of further detention at headquarters, during which arraignment could easily have been made in the same building in which the police headquarters were housed, petitioner was examined by a lie-detector operator for another hour and a half before his story began to waiver. Not until he had confessed, when any judicial caution had lost its purpose and the police arraign him".

In the case at bar, questioning of the defendant was attempted immediately upon the defendant being brought to the police station. Arkansas State Policeman Beech specifically advised the defendant of his constitutional rights and when the defendant claimed them, nothing further was asked of him.

Miranda v. State of Arizona, supra, is not authority for prohibiting use of defendant's statements by the prosecution but the Supreme Court reaffirmed the Fifth Amendment privilege that an individual may not be compelled to incriminate himself. The Court stated:

"Without proper safeguards the process of in custody interrogation of persons specifically accused of crime contains inherent compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored."

The Court after acknowledging that the Congress might devise procedures which would be effective in apprising the accused of his right to silence and in assuring a continuous opportunity to exercise it, specified safeguards which must be observed in order to make the statements admissible. The Court required:

1. That the person in custody must first be informed in clear and unequivocable terms that he has the right to remain silent.

2. The warning to remain silent must be accompanied by the explanation that anything said can and will be used against him in Court.

3. He must be clearly informed that he has the right tó consult with a lawyer and to have the lawyer with him during the interrogation.

4. He must be told that if he is indigent a lawyer will be appointed to represent him.

■ These safeguards were observed by Special Agent Thomas in his warning to the defendant. Thereafter, by an express statement reduced to writing, Theriault stated he desired to make a statement and did not want an attorney which was immediately followed by his statement. The facts surrounding the statements in this case clearly demonstrate that the defendant knowingly and intelligently waived his rights and agreed to make a statement satisfying the requirements of Miranda v. State of Arizona, supra.

Although considerable delay occurred from the time of the arrest until the defendant was brought before this court for arraignment on his indictment, there was at no time "custodial interrogation" as the term is used in Miranda. Defendant's statements to Special Agent Thomas on February 16 and 17 were made on defendant's own initiative, freely and voluntarily. At the time of the statements to Special Agent Thomas, the defendant was under indictment and being held under its authority thereby eliminating a need for Rule 5 hearing before the Commissioner. The record does not disclose that the authorities attempted to deny the defendant any rights under Rule 5 in order to obtain an unlawful statement and there is no relationship between the failure to take the defendant before a Commissioner for a preliminary

hearing and his statement to Special Agent Thomas. His statements were the result of an independent act of his free will. Even if the defendant was illegally detained there was sufficient evidence of freedom of mind so that any illegal detention could not have infected the later statements. Rogers v. United States, 5 Cir., 330 F.2d 535.

The evidence reveals that the arresting officers secured property from three different locations near the time of the arrest of the defendant. A pistol and American Travelers checks were found under the mattress of the bed in which the defendant was seen to be lying. Rolls of coins, and a gun in the glove compartment and a cigar box with other personal property was located in the cab of the pick-up truck. Tools, wrapped coins, loose coins, bags used by banks to carry money, a closed black bag, all in a cardboard box were seen by the Chief of Police in the rear of the pick-up truck.

The defendant moves to suppress as evidence introduction of this property.

The Government admits that there was no warrant for the arrest of the defendant, nor was there a search warrant outstanding at the time the defendant and the property were taken into custody. The Government attempts to justify the seizure of the property located in the back of the pick-up truck by stating that it was not the subject of a search as contemplated by the 4th Amendment. The undisputed facts disclose that the Chief of Police prior to the arrest, while standing in the driveway of the motel, a place where he had a legal right to be, observed in plain view the property in the rear of the truck, including the contents of the cardboard box situated therein. Such observation does not amount to a search. United States v. Comb, 203 F.Supp. 202 (Ark.W.D.); Busby v. United States, 9 Cir., 296 F.2d 328. The later seizure of the property in the back of the truck following the arrest of the defendant was lawful because the coins and bank bags were thought to be fruits of the crime and the tools which the Chief of Police reasonably classified as instrumentalities used in the crime.

A search of the person and the premises made incidental to a lawful arrest is a recognized exception to the requirements of the 4th Amendment that a search warrant be first obtained, United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653; Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652.

Reasonable grounds for suspicion when accompanied by facts or circumstances strong enough to justify a reasonably cautious man to believe the guilt of a suspect suffice to constitute probable cause for arrest without a warrant, Feguer v. United States, 302 F.2d 214 (247) (8th Cir.); Schook v. United States, 337 F.2d 563 (8th Cir.). An attempt to set down the required elements of probable cause as a general proposition is neither necessary nor desirable and in determining whether there is probable cause each case must rest upon its own facts, United States v. Nichols, 78 F.Supp. 483 (W.D.Ark.) The collective information of the police, both from personal knowledge and hearsay from reliable sources may be the basis of probable cause, Hawkins v. United States, 288 F.2d 537 (8th Cir.); Smith v. United States, 123 U.S.App.D.C. 202, 358 F.2d 833; Ng Pui Yu v. United States, 352 F.2d 626; Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. The Court finds from the evidence that the arresting officers knew from their own personal observation or from reliable informants sufficient facts and circumstances to justify a reasonable man to believe the guilt of the defendant of the burglary of the Bank of Parkdale, Parkdale, Arkansas.

The arresting officers knew the Bank of Parkdale had been burglarized and that two men, one of whom had an injured foot, were driving in a late model pick-up truck with a vinyl top and without a rear bumper, were suspected of being the burglars. The officers knew that two men, one of whom had an injured foot, had registered in Rooms

19 and 20 of the Sahara Motel, DeWitt, Arkansas, after arriving together in a late model pick-up which was without a rear bumper and which fit the description previously broadcast on the police radio and television as the vehicle being used by the burglars. They were informed one of the men had exchanged ten rare Kennedy half dollars for a $5.00 bill and later cashed an incorrectly made travelers check for $20.00 to pay for sandwiches. They knew that one of the men had made a telephone call and returned to the motel room and they were informed that the suspects were going to check out at 7:00, which they reasonably took to be 7:00 p. m. The officers knew the truck contained tools which would be useful in committing a burglary and that rolls of coins, money bags, loose coins, which they reasonably suspected to be the fruits of the crime, were in the truck which was in a running condition. The officers knew the defendant with a bleeding foot and armed was in one of the two rooms and the defendant was seen lying in bed with his bad foot exposed through an open door prior to the defendant being placed in custody. These facts furnished probable cause for the arrest of the defendant and authorized search and seizure of property incidental to the arrest.

The search of the defendant's bed and the mattress thereon was done immediately after the defendant had been placed in custody and was but a continuing act carried on as soon as reasonably could be done considering the condition of the defendant, the place and circumstances under which the arrest took place. No considerable time elapsed and the arrest and search of the bed in which the defendant was lying was as a practical matter contemporaneous.

The seizure of the articles from the truck and their transport to the police station occurred immediately after the defendant was placed under arrest and was substantially contemporaneous with the arrest.

Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777

held as inadmissible evidence obtained as an incident to the arrest where the search was too far removed in time and place. The facts in *Preston* are not similar to the facts in the case at bar. There the defendants were arrested on vagrancy and the fruits of the crime, the instrumentalities for committing the crime, weapons or contraband, things for which a search may lawfully be made were not reasonably sought or to be expected in the search of the Preston vehicle. Here, however, the Chief of Police had lawfully seen the fruits of the crime and instrumentalities including the truck itself which he reasonably believed to have been used in the crime in plain view. The unloading of the pick-up truck at the police station was but an uninterrupted and continuing action of the police initiated by the lawful arrest of the defendant. The facts in this case are similar to those found in Price v. United States, 121 U.S.App.D.C. 62, 348 F.2d 68, which held the search and seizure of the defendant's car at the police station was not an unreasonable search and seizure. There the Court said:

"In the present case the tools, rolls of quarters and the bag or envelope containing the brass fittings were seen in the car by the officers at the time they arrested defendant. The car with these visible articles was removed to the station at the same time defendant was taken there in a different car. The articles when seen were under defendant's immediate control and consisted of implements for the commission of a safe robbery and the fruits of the robbery. See Preston v. United States, supra, 376 U.S. at 367, 84 S.Ct. 881, 11 L.Ed.2d 777. The seizure of the tools, rolls of quarters and bag of brass fittings as incidental to the original arrest is not obscured by the failure of the officers to take these articles from the car at the time of the arrest instead of waiting until the car in which they visibly reposed reached the station. As to the tools,

quarters and brass fittings we find no unreasonable search or seizure.

"This leaves the other envelope. As we have said, some 20 or 25 minutes after the car was placed in the parking lot Detective Baker saw a man reaching under the front seat of the car and saw the lights blinking on and off. He arrested the man, took him inside, returned to the car and found the envelope. Thus he came into its possession at the place of the arrest and contemporaneously with it; for the sequence followed by the officer, that is, first taking the arrestee into the station, was a reasonable and practical one and the brief time thus consumed did not destroy the contemporaneousness of the search. For this reason we conclude that the seizure of the envelope was also not the result of unreasonable search or seizure.

"The indications were strong that the automobile had been used in the robbery and as a carrier of articles stolen; and the two locations of the car were the very locations at which the two arrests were made. The search of the car at the parking lot which disclosed the envelope after the incident of the blinking lights was part of a continuing series of events which included the original arrest and continued uninterruptedly as lawful police investigation and action. We cannot characterize the conduct of the officers in the circumstances here disclosed as violative of the Fourth Amendment prohibition against an unreasonable search and seizure." Affirmed.

The evidence found in the pick-up truck was not as a result of an unlawful search and seizure.

For the reasons above stated, the Motion to Suppress the evidence should be overruled. An Order in accordance with the above is being entered today in which the exceptions of the defendant will be noted.